UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
UNITED STATES OF AMERICA                                 :
                                                        :
            v.                                           :
                                                        :          No. 11-cr-293 (VM)
BRIAN SCOTT ZWERNER,                                     :
                                                        :
            Defendant.                                   :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AMENDED SENTENCING MEMORANDUM OF BRIAN SCOTT ZWERNER

**REDACTED**

Katya Jestin
Anne Cortina Perry
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York  10022

*Counsel for Brian Scott Zwerner*

**TABLE OF CONTENTS**

I.      Introduction .................................................................................................1

II.     Factual Background .....................................................................................2

        A.      Mr. Zwerner's Family Life .............................................................2

        B.      Mr. Zwerner's Early Professional History Leading Him to the
                Municipal Bond Business ...............................................................6

        C.      Mr. Zwerner's Role in the Conspiracy ...........................................7

        D.      Mr. Zwerner's Extensive Cooperation ...........................................10

III.    Governing Legal Standards and Argument ..................................................13

        A.      Legal Landscape .............................................................................13

        B.      An Application of Section 3553(a) Factors to Brian Zwerner
                Demonstrates the Propriety of a Non-Custodial Sentence. ............14

                1.      Mr. Zwerner's remarkable rehabilitation over the last six years
                        illustrates the propriety of a non-custodial sentence. ..........14

                        a.      Mr. Zwerner's lengthy and consistent cooperation
                                merits a non-custodial sentence. ................................14

                        b.      Mr. Zwerner's meaningful contributions to his family
                                and community, contributions he could continue to
                                make if given a noncustodial sentence, demonstrate his
                                rehabilitation and the appropriateness of a non-
                                custodial sentence .......................................................16

                2.      A non-custodial sentence would ensure that Mr. Zwerner is
                        punished sufficiently but not more than necessary...............18

                3.      A non-custodial sentence is particularly appropriate given that
                        Mr. Zwerner will have already paid restitution to the victim of
                        his crime. ...............................................................................21

                4.      Principles of horizontal equity among defendants
                        demonstratethe appropriateness of a non-custodial sentence
                        for Mr. Zwerner. ....................................................................22

IV.     Conclusion ...................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Chhabra v. United States*,
    No. 09-cv-1028 (LAP), 2010 WL 445582 (S.D.N.Y. Nov. 3, 2010) ............................... 14-15

*Gall v. United States*,
    552 U.S. 38 (2007)..........................................................................................................14

*Kimbrough v. United States*,
    552 U.S. 85 (2007)..........................................................................................................13

*Lieberman v. United States*,
    839 F. Supp. 263 (S.D.N.Y. 1993).................................................................................19

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)............................................................................20

*United States v. Bertelle*,
    No. 09-cr-253, 2010 WL 276597 (E.D.N.Y. Jan. 19, 2010)...................................17

*United States v. Booker*,
    543 U.S. 220 (2005)........................................................................................................13

*United States v. Butler*,
    264 F.R.D. 37 (E.D.N.Y. Jan. 22, 2010).......................................................................17

*United States v. Campbell*,
    10-CR-803 (S.D.N.Y. 2014)..........................................................................................26

*United States v. Carollo*,
    10-CR-654-01 (S.D.N.Y. 2012).....................................................................................23

*United States v. Duran*,
    399 F. Supp. 2d 543 (S.D.N.Y. 2005)............................................................................27

*United States v. Fernandez*,
    443 F.3d 19 (2d Cir. 2006),....................................................................................... 15-16

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993).................................................................................19

*United States v. Galante*,
    111 F.3d 1029 (2d Cir. 1997).........................................................................................17

*United States v. Gardellini*,
    545 F.3d 1089 (D.C. Cir. 2008).....................................................................................19

*United States v. Ghavami,*
   10-cr-1217-01 (S.D.N.Y. 2013)....................................................................23

*United States v. Goldberg,*
   10-CR-209 (S.D.N.Y. 2014).........................................................................25

*United States v. Goldberg,*
   10-CR-654-02 (S.D.N.Y. 2012)....................................................................23

*United States v. Grimm,*
   10-CR-654-03 (S.D.N.Y. 2012)....................................................................23

*United States v. Heinz,*
   10-CR-1217-02 (S.D.N.Y. 2013)..................................................................23

*United States v. Jones,*
   460 F.3d 191 (2d Cir. 2006).........................................................................13

*United States v. Kanefsky,*
   10-CR-721 (S.D.N.Y. 2013).........................................................................26

*United States v. Menendez,*
   600 F.3d 263 (2d Cir. 2010).........................................................................22

*United States v. Naeh,*
   10-CR-139 (S.D.N.Y. 2014).........................................................................25

*United States v. Santos,*
   406 F. Supp. 2d 320 (S.D.N.Y. 2005)..........................................................27

*United States v. Stewart Wolmark and Evan Zarevsky,*
   09-CR-1058 (S.D.N.Y. 2013)................................................................23, 24

*United States v. Valentin,*
   239 F. App'x 674 (2d Cir. 2007) ..................................................................22

*United States v. Welty,*
   10-CR-1217-03 (S.D.N.Y. 2013)..................................................................23

*United States v. Wills,*
   476 F.3d 103 (2d Cir. 2007),.........................................................................22

*United States v. Zaino,*
   10-CR-434 (S.D.N.Y. 2014)....................................................................25, 26

**STATUTES**

15 U.S.C. § 1...............................................................................................25, 26, 27

18 U.S.C. § 371 ...................................................................................................... passim

18 U.S.C. § 1005 ...................................................................................................10, 14

18 U.S.C. § 1343 .............................................................................................25, 26, 27

18 U.S.C. § 1346 ...........................................................................................................27

18 U.S.C. § 3553(a) ............................................................................................... passim

18 U.S.C. § 3559(a) ......................................................................................................14

18 U.S.C. § 3561(a) ......................................................................................................14

18 U.S.C. 3663A ...........................................................................................................21

U.S.S.G. § 5K1.1 ..........................................................................................................15

## OTHER AUTHORITIES

Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S (2011) ........................................................................20

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421 (2007) ...........................20

Government's Consolidated Application for Restitution, *United States v. Wolmark and Zarefsky*, No. S1 09-CR-1058 (S.D.N.Y. July 9, 2013), ECF No. 418 ............................23, 24

Government's Consolidated Application for Restitution, *United States v. Rothman*, No. 10-CR-200 (S.D.N.Y. July 9, 2013), ECF No. 418 ................................................................23

Sentencing Letter by United States as to Douglas Lee Campbell, *United States v. Campbell*, No. 10-CR-803 (S.D.N.Y. Apr. 24, 2014), ECF No. 26 ................................25, 26

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006) ...................20

Transcript of Sentencing, *United States v. Campbell* No.10-CR-803 (S.D.N.Y. Apr. 22, 2014), ECF No. 28 ......................................................................................................25

Transcript of Sentencing, *United States v. Goldberg*, No. 10-CR-209 (S.D.N.Y. May 8, 2014), ECF No. 30 ......................................................................................................24

Transcript of Sentencing, *United States v. Hertz*, No. 10-CR-1178 (S.D.N.Y. Dec. 18, 2013), ECF No. 38 ....................................................................................................25

Transcript of Sentencing, *United States v. Kanefsky*, No. 10-CR-00721 (S.D.N.Y. May 17, 2013), ECF No. 18 ..............................................................................................25

Transcript of Sentencing, *United States v. Naeh*, No. 10-CR-139 (May 8, 2014), ECF No. 24.................................................................................................................................19, 21

Transcript of Sentencing, *United States v. Scott-Jones*, No. 10-CR-794 (S.D.N.Y. Jan. 3, 2013), ECF No. 22 ......................................................................................................24

Transcript of Sentencing, *United States v. Wright*, No. 12-CR-551 (S.D.N.Y. Oct. 31, 2013), ECF No. 19 ..............................................................................................21, 25, 26

Transcript of Sentencing, *United States v. Zaino*, No. 10-CR-434 (S.D.N.Y. Mar. 27, 2014), ECF No. 23 ..............................................................................................20, 24

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) .........................................................................20

**<u>TABLE OF EXHIBITS</u>**

Letter of Renee Zwerner                          Ex. 1

Letter of Michelle Mund                          Ex. 2

Letter of Jodie Zwerner                          Ex. 3

Letter of Adam Hertzog                           Ex. 4

Letter of J. David Scheiner                      Ex. 5

Letter of Richard Winfrey                        Ex. 6

Respect Game Sports Materials                    Ex. 7

Letter of Jeffrey Lowe                           Ex. 8

Letter of Ricardo Diaz                           Ex. 9

Securities and Exchange Commission,              Ex. 10
Offer of Settlement of Brian Scott Zwerner

I.      **Introduction**

Mr. Zwerner respectfully submits this Memorandum to the Court in advance of his

Sentencing Date of July 25, 2014.  Nothing in this Memorandum is intended to minimize

Mr. Zwerner's improper and illegal conduct, or to indicate that Mr. Zwerner's acceptance of

responsibility is anything less than complete.  It is solely intended to place Mr. Zwerner's

conduct between 1999 and 2002, while employed at Bank of America, in the context of all

aspects of his life and character, both before and after that period, including his extensive and

dedicated cooperation with the government over the last six years and his payment of restitution

to Bank of America under the Mandatory Victims Restitution Act ("MVRA").  Mr. Zwerner has

also accepted a complete, unlimited bar from the Securities and Exchange Commission ("SEC"),

prohibiting him from working in virtually every capacity in the securities industry, including

with a broker, dealer, or investment adviser.

Mr. Zwerner was charged with and pled guilty to one count of conspiracy to falsify bank

documents for his role in the municipal bond bid-rigging conspiracy.  Mr. Zwerner admitted to

maintaining a spreadsheet that accounted for over- and under-reporting of marketing profits on

trade tickets for certain municipal bond deals; this spreadsheet operated in service of a scheme in

which the over- and under-reporting was used to facilitate kickback payments to certain brokers.

Mr. Zwerner is ashamed of his role in this conduct.  He dreads nothing more than the day

he must explain the circumstances of his criminal conviction to his young children.  He regrets

nothing more than the fact that his father passed away approximately 18 months ago uncertain of

the outcome of these proceedings.  Mr. Zwerner's contrition is deep and abiding, evinced by his

six years of cooperation with the government in any way requested.

By this submission, we respectfully urge that Mr. Zwerner should receive a non-custodial

sentence in consideration of Mr. Zwerner's personal characteristics and history, including his

demonstrated capacity for rehabilitation, family obligations, extensive cooperation and payment of restitution as described herein.

**II.    Factual Background**

A deeply committed son, brother, husband and father, Mr. Zwerner has always been a rock for his family members, never more so than today.  Mr. Zwerner's early career path took him to Bank of America at the age of 25, where he worked again for his first boss and mentor, Phil Murphy.  By 2002, Mr. Zwerner had moved out of the municipal finance world.  Since 2008, Mr. Zwerner has been an active cooperator with the government in its investigation of the municipal bond industry.

**A.    Mr. Zwerner's Family Life**

Mr. Zwerner grew up in southern Florida, the only son of Renee Zwerner, an elementary schoolteacher, and Allan Zwerner, a fashion executive.  He was a "bright young man" who "excelled in school, was very social, and was a wonderful big brother" to his sister, Michelle. (Letter of R. Zwerner, attached hereto as Exhibit 1, at 1.)  The young Mr. Zwerner was very close to his family.  In addition to babysitting his younger sister on the weekends (Letter of R. Zwerner, Ex. 1, at 1), he tutored her in math and science as well, instilling in her the value and importance of education (Letter of M. Mund, attached hereto as Exhibit 2, at 1).  As a high-schooler, Mr. Zwerner selected recipes with his mother and discussed work with his father. (Letter of M. Mund, Ex. 2, at 1.)

Mr. Zwerner and his sister remained close after he left for Wharton Business School at the University of Pennsylvania.  Mr. Zwerner was a role model for her; he always made her feel safe, giving her "the space to experience life but was always there to pick up the pieces that fell along the way."  (Letter of M. Mund, Ex. 2, at 1-2.)  When his sister Michelle confronted a

difficult period in college, it was Mr. Zwerner who "stepp[ed] in and help[ed] all of the family manage" his sister's illness.  (Letter of M. Mund, Ex. 2, at 2.)

Mr. Zwerner met his wife Jodie when the two moved into the same apartment building in Chicago.  They married in 2000 and had a son, ███████, in 2002, and a daughter, who is known by ████████████████, in 2004.  (Letter of J. Zwerner, attached hereto as Exhibit 3, at 2-3.)  *See also* Pre-Sentence Investigation Report in *United States v. Zwerner*, 1:11-CR-00293-001 ("PSR")[1], ¶¶ 72-73.  Mr. Zwerner supports his family, not only financially, but also emotionally and socially as well.  Mr. Zwerner's wife describes him as "a loving and extremely supportive husband, [and] an attentive father."  (Letter of J. Zwerner, Ex. 3, at 1.)  His mother notes his devotion to his children and the integral role he plays in their everyday lives.  (Letter of R. Zwerner, Ex. 1, at 1.)  His sister noted his "quite amazing" engagement with his children, including his involvement in their schooling, and his role as a devoted follower of each of his son's basketball games and his daughter's school performances and dance recitals.  (Letter of M. Mund, Ex. 2, at 2.)

Mr. Zwerner is a deeply devoted son, brother, husband, and father.  It is Mr. Zwerner who makes ████ and ████████ breakfast, and brings them to school every morning.  It is Mr. Zwerner who attends ██████ practices and ████████ performances.  And it is Mr. Zwerner who helps his children with their math and science homework.  (Letter of R. Zwerner, Ex. 1, at 1).  It is no surprise, then, that his wife Jodie says it "would be devastating for the children and me both if Brian is taken away from us" (Letter of J. Zwerner, Ex. 3, at 4), and that his mother states that it "would be incomprehensible to his kids not to have him present in their lives."  (Letter of R. Zwerner, Ex. 1, at 1.)  *See also* Letter of A. Hertzog, attached hereto as

---

[1] This amended Memorandum updates the citations herein to the appropriate paragraph numbers in the final PSR sent July 22, 2014.

3

Exhibit 4, at 1. ("There are plenty of dads dedicated to their families but none more so than Brian.")

Beyond his immediate family, Mr. Zwerner remains a pillar of support for his sister and his mother. This has never been more true since his father, Allan Zwerner, passed away approximately a year and a half ago. When Mr. Zwerner's father fell ill with prostate cancer in 2006, Mr. Zwerner stepped up to provide immense support for his father during treatment, and for his mother as well. Mr. Zwerner "visited us constantly," and was a "calming force and a comfort" to his parents during this ordeal. (Letter of R. Zwerner, Ex. 1, at 1-2.) Family friend David Scheiner noted that "[e]ven though he lived some 700 miles away," Mr. Zwerner took "control and [became] very supportive of the family and all of their affairs." (Letter of J. David Scheiner, attached hereto as Exhibit 5, at 2.) For Mr. Scheiner, a dear friend of Mr. Zwerner's father, "[i]t was a time when I could see what a caring, generous, and thoughtful person [Mr. Zwerner] was." (Letter of J. David Scheiner, Ex. 5, at 2.)

Today, Mr. Zwerner is "a major support to his mother in every way that a mother could ask of her son." (Letter of J. David Scheiner, Ex 5, at 2.) His sister Michelle reports that her mother stated that after her husband's death, Mr. Zwerner "literally saved her." (Letter of M. Mund, Ex. 2, at 3.) Mr. Zwerner speaks to his mother daily, providing her with guidance and financial advice, and every day "honor[s] his promise to his father to take care of" his mother. (Letter of R. Zwerner, Ex. 1, at 2.) Given the recent trauma of her husband's passing, his mother "cannot imagine Brian not being here for" her. (Letter of R. Zwerner, Ex. 1, at 2.) It is "one of his biggest regrets . . . that his father" passed "not knowing the final outcome of these legal proceedings." (Letter of J. Zwerner, Ex. 3, at 5.) His mother told a probation officer that

4

Mr. Zwerner is "invaluable," and that she "couldn't do it" and "couldn't possibly manage without" him.  PSR ¶¶ 75-76.

Inspired by his family, Mr. Zwerner contributes to the community, both financially and through volunteering his time.  For several years, Mr. Zwerner donated his time, talents, and financial resources to the organization Respect Game Sports, an inner-city youth basketball league in his current hometown of Atlanta, which participates in the prestigious Amateur Athletic Union.  (Letter of R. Winfrey, attached hereto as Ex. 6, at 1.)  *See also* PSR ¶ 81.  Many of the young participants and their families could not afford to travel to the tournaments where they could compete with the best teams, developing their skills to the fullest.  Mr. Zwerner took on the responsibility of funding those players, through fundraising from local sponsors and direct financial assistance.  (Letter of R. Winfrey, Ex. 6, at 1.)  As the head of fundraising for the organization, he developed materials and monthly newsletters to inspire sponsors and potential sponsors.  (Exhibit 7.)  Mr. Zwerner even bore the responsibility of personally chaperoning certain students on those trips when their own parents were financially unable to attend, sharing his own hotel room with them.  (Letter of J. Zwerner, Ex. 3, at 5-6.)

His commitment to the organization has grown so deep that even though Mr. Zwerner's son now participates in a different basketball program, Mr. Zwerner still assists with Respect Game.  (Letter of R. Winfrey, Ex. 6, at 2.)  Mr. Zwerner also volunteers significant time and effort to local events, including coaching in youth sports leagues and volunteering at his children's school.  Mr. Zwerner has coached youth basketball, football, baseball, and soccer. (Letter of J. Zwerner, Ex. 3, at 3.)

In addition, Mr. Zwerner has contributed financially to numerous charities over the last decade.  This includes health care organizations such as the American Cancer Society, the

American Heart Association, the University of Miami Cancer Center and Children's Healthcare of Atlanta; disaster relief, such as the Wachovia Katrina Relief Fund; and educational organizations including the Adaptive Learning Center, Warren T. Jackson Elementary School, and Cathedral Preschool.  In 2005, Mr. Zwerner established a scholarship at the University of Pennsylvania for disadvantaged students from Florida or Georgia.  (Letter of J. Zwerner, Ex. 3, at 5.)  In addition to the financial contribution, Mr. Zwerner also offers the recipients mentoring and advice in any way he can.  (Letter of J. Zwerner, Ex. 3, at 5.)  Jointly with his mother and sister, Mr. Zwerner also endowed a Young Menswear Association ("YMA") Fashion Scholarship Fund for the study of fashion arts and business in honor of his late father, Allan Zwerner.

**B.      Mr. Zwerner's Early Professional History Leading Him to the Municipal Bond Business**

After graduating from Wharton Business School at the University of Pennsylvania *magna cum laude* with a B.S. in Economics, PSR ¶ 89, Mr. Zwerner, at age 22, took a position at First Union Bank, where his boss was Phil Murphy.  Mr. Zwerner worked at First Union Bank from 1995 until 1997.  His duties included the marketing of interest rate hedging products. Mr. Murphy, and other more senior marketers, trained Mr. Zwerner in the business, allowed him to listen in on their phone calls, and taught him how to set up trades and read bid documents. Mr. Murphy also introduced him to brokers such as Rubin/Chambers Dunhill Insurance Services, Inc. ("CDR"), and Mr. Zwerner recalls being introduced in this time period by Mr. Murphy to municipal bond bid-rigging practices.  PSR ¶ 30.  In early 1997, Mr. Zwerner left First Union and took a position at Chase Manhattan Bank—both because he wanted to move to New York, and because the Chase position was on the trading side of the municipal derivatives business, which Mr. Zwerner preferred.

In 1998, when he was 25, Mr. Zwerner was recruited by his former boss and mentor, Mr. Murphy, to work at Bank of America.  PSR ¶ 30.  Mr. Murphy had started a municipal bond derivatives desk for Bank of America, and he recruited Mr. Zwerner to work on the trading side of the desk.  At Bank of America, he would have a more senior title than the title he had at Chase, and he accepted the position.  PSR ¶ 30.  For this position, Mr. Zwerner moved to Chicago, Illinois.  PSR ¶ 30.  Mr. Murphy was based out of Charlotte, as were the other marketers he hired to assist in growing the business.

### C.       Mr. Zwerner's Role in the Conspiracy

At Bank of America, between 1998 and approximately 2000, Mr. Zwerner primarily focused on pricing trades and hedging transactions.  In this capacity, Mr. Zwerner worked closely with the marketers, who operated under the leadership of Mr. Murphy.  Mr. Murphy and his marketers engaged in an illegal practice known as "last looks":  the broker arranging a municipal bond derivative transaction would tell the marketers the lowest bid at which Bank of America could win the transaction.  The marketers at Bank of America also participated in other forms of bid-rigging, such as giving intentionally losing bids at the request of brokers like CDR to enable another bank selected by the broker to win the bid.

For Mr. Zwerner's part in these transactions, at the bid stage, he would assist the marketers in setting the "maximum" yield to be offered by the Bank for the transaction. Specifically, when Bank of America would issue a bid for a given municipal finance deal, the marketers would ask a trader like Mr. Zwerner for the maximum yield.  Mr. Zwerner used a mathematical model to arrive at an estimate, and professional judgment to hone that figure.  The judgment exercised by Mr. Zwerner in setting the maximum yield might revise the result produced by the mathematical model by only one quarter to one half of a basis point.  In addition, after a transaction was completed, Mr. Zwerner would "hedge" the transaction:  he

would execute other trades (for example, an interest rate swap) that would counterbalance the risk incurred by Bank of America for the transaction.

In 1999, Phil Murphy asked Mr. Zwerner for help resolving a problem Mr. Murphy's team had created.  Due to an error by a marketer on Mr. Murphy's team, the group had won a deal that would not be profitable for Bank of America, and Mr. Murphy's reputation within the Bank would have suffered.  Mr. Murphy suggested that if Mr. Zwerner would agree to show the loss on the books as a post-trade loss (*e.g.*, Mr. Murphy's team would mark the trade ticket as showing zero profit and zero loss on the trade, so that when the deal was valued the loss would appear on Mr. Zwerner's books as a hedging loss).  Mr. Murphy would later "reimburse" him by marking the value on the trade ticket of a future deal as lower than what the Bank had actually earned on it.  At the end of the second transaction, the Bank's books would be "net" in the same position as if both of the transactions had been recorded accurately.

Mr. Zwerner acquiesced to Mr. Murphy's request.  Mr. Murphy began to make additional, similar requests.  Concerned that if these transactions occurred more frequently, it would be difficult to ensure that each was accurately and timely reversed by a later transaction, Mr. Zwerner began to keep track of the adjustments made by Mr. Murphy on a spreadsheet. Later, other marketers on Mr. Murphy's team, including Doug Campbell, would similarly submit requests to "deposit" or "deduct" sums from the secret spreadsheet maintained by Mr. Zwerner that became known as the "kitty" or the "bank."  PSR ¶ 35.  A misstatement that made a trade look more profitable was called a "withdrawal."  A misstatement that made a trade look less profitable was called a "deposit."  Mr. Zwerner's reason for tracking the misstatements was to ensure that at the end of the year, the "deposits" matched the "withdrawals," thus causing the aggregate profit and loss values reported for the year to be correct.  Nonetheless, the inaccurate

trade tickets remained, and the interim inaccurate marketing profits were permanently recorded in the Bank's sales tracking and reporting database, called STARS.

Before long, Mr. Murphy and the other marketers realized that this method of making and reversing misstatements could be used for a reason other than to mask errors or make his team look good. The kitty could be used to hide "kickbacks" paid to brokers in anticipation of those brokers sending Bank of America business. Thus, the kitty came to be used to facilitate a portion of a broader conspiracy involving brokers including CDR, in which the brokers and banks rigged the bids presented to various municipal bond clients. PSR ¶¶ 32-33, 35.

Over time, Mr. Zwerner's role at Bank of America evolved. By 2000, his responsibilities for hedging and derivatives outside municipal finance increased. Accordingly, he had less contact with Mr. Murphy's team of municipal bond marketers in Charlotte over the course of the next few years. Mr. Zwerner continued to record entries in the kitty at the direction of Mr. Murphy, Mr. Campbell, and occasionally one or two others, until mid-2002. PSR ¶ 35.

To be clear, Mr. Zwerner received no kickbacks himself. Mr. Zwerner's annual compensation and bonus were set by his supervisor in the trading group, not by Mr. Murphy (although Mr. Murphy may have been consulted regarding Mr. Zwerner's bonus). Thus, Mr. Zwerner never received any direct financial benefit from maintaining the kitty. However, Mr. Zwerner readily admits his role in facilitating the conspiracy, by maintaining the kitty, which permitted Mr. Zwerner, Mr. Murphy, and others, to keep track of the kickbacks paid to brokers and helped to avoid detection of the scheme.

At the end of 2002, Mr. Zwerner moved to London, England, to take a position as the global head of structured rates for Bank of America. He left that position in 2005 to work for Wachovia Bank as Managing Director and the Head of Structured Derivative Products. PSR

9

¶ 93.  It was these years that were Mr. Zwerner's most financially successful, both in his compensation and through his personal investments.  PSR ¶¶ 93, 96, 98.  In late 2007, Mr. Zwerner's position at Wachovia was eliminated as part of a workforce reduction.  For the next few years, he operated as a financial consultant, and later joined with colleagues to form a partnership providing valuation and risk management services.  PSR ¶ 93.  In 2010, Mr. Zwerner accepted a position with FIG Partners, a boutique investment bank focused on regional and community banks.  PSR ¶ 93.  In 2011, Mr. Zwerner pled guilty before Magistrate Judge Maas.

### D.      Mr. Zwerner's Extensive Cooperation

On March 30, 2011, after cooperating with the government for over three years, Mr. Zwerner pled guilty to one count of conspiracy to make false entries in books and reports of a national bank from at least as early as January 1999 until at least May 2002.  18 U.S.C. §§ 371, 1005; *see* PSR ¶¶ 1-3.  Mr. Zwerner admitted that he "along with other people in the marketing group . . . misstated the profit on municipal client transactions using an off-the-record account . . . with the intent of facilitating the marketers in making kickback payments to brokers by disguising the losses associated with these payments."  Plea Hr'g Tr. at 13 (March 30, 2011); PSR ¶ 45 (quoting allocution).

Mr. Zwerner's cooperation began in late 2007; Mr. Zwerner's counsel approached the government regarding Mr. Zwerner's potential cooperation, and on January 7 and 8, 2008, Mr. Zwerner met with officials from the Department of Justice ("DOJ") and the SEC for the first time.  Over the course of the next six years, Mr. Zwerner spoke with government officials to provide information or prepare to testify at trial over 30 times.  From the start, Mr. Zwerner readily and candidly admitted his involvement in the municipal bond bid-rigging conspiracy.  Throughout his cooperation, which lasted from late 2007 to February 2014, when Mr. Zwerner

10

was ready to testify at the trial of his former boss and mentor, Mr. Murphy, Mr. Zwerner has made himself available whenever and wherever the government needed him.

Mr. Zwerner's cooperation included fulsome provision of information relating to the municipal bond bid-rigging conspiracy. This included a multitude of lengthy proffer sessions in which Mr. Zwerner detailed, without hesitation, and from the very beginning, everything he knew about the broader conspiracy, including providing key insights into the maintenance of the kitty, and efforts by him and Mr. Murphy to cover it up when interviewed by Bank counsel in 2002. Mr. Zwerner was the first person to provide the government with detailed information about the kitty and to explain how it functioned; he also provided specific search terms which the government successfully used to locate copies of the kitty being transmitted between Mr. Zwerner and Mr. Murphy, which it did not previously have. Mr. Zwerner also engaged in detailed reconstruction of deals for the government, leveraging his financial acumen to assist the government in understanding the full picture of the municipal bond industry. To aid the DOJ, Mr. Zwerner paged through trade ticket after trade ticket, and carefully and precisely noted where those transactions were reflected in the kitty and in databases maintained by Bank of America. Additionally, Mr. Zwerner offered his finance expertise to explain the network of relationships between the bank and brokers to the government and certain transactions to the DOJ—including demonstrating how a pattern of transactions could be used to show a specific individual's criminal intent.

Mr. Zwerner also prepared to testify in three trials: *United States v. Rubin/Chambers, Dunhill Insurance Services*, 09-CR-1058 (S.D.N.Y.); *United States v. Ghavami*, 10-cr-1217 (S.D.N.Y.); and *United States v. Murphy*, 3:12-cr-235 (W.D.N.C.). In 2011, Mr. Zwerner prepared extensively for the trial of David Rubin, Zevi Stewart Wolmark, and Evan Zarefsky,

scheduled for January 2012, and appeared on the witness list.  Mr. Rubin pled guilty on December 30, 2011.  Ten days later, with jury selection completed and with Mr. Zwerner set to fly to New York to testify, Messrs. Wolmark and Zarefsky also entered guilty pleas.

In preparation for the *Ghavami* trial in 2012, Mr. Zwerner met extensively with DOJ attorneys in New York and Chicago.  Ultimately, despite his preparation and willingness to testify, the government determined it did not require Mr. Zwerner's testimony for its case.

Then, in 2013, Mr. Zwerner prepared to testify in *United States v. Murphy*, the government's case against his former boss Mr. Murphy, brought in the Western District of North Carolina.  Mr. Zwerner traveled from Atlanta to New York several times for preparation sessions, flying at times in difficult wintry weather conditions to be present in person and assist the government in preparing its case against Mr. Murphy.  Aware that Mr. Zwerner was on the government's witness list, on the eve of trial, Mr. Murphy elected to plead guilty to three counts—wire fraud, conspiracy to commit fraud, and conspiracy to falsify bank records; it stands to reason that Mr. Murphy's guilty plea was prompted by the prospect of his former mentee testifying against him.  Thus, Mr. Zwerner's committed assistance to the government in preparing its case—which was aggressively litigated by the defense—greatly contributed to a plea to all counts by Mr. Murphy.  That conviction marked the 13th individual to plead guilty since Mr. Zwerner began cooperating—likely, at least in part, because of the prospect of cooperators like Mr. Zwerner taking the stand.

In addition to assisting the DOJ and the IRS agents involved in the municipal bond bid-rigging investigation, Mr. Zwerner also assisted the SEC, not only in the municipal bond bid-rigging investigation, but also with its understanding of complex Residential Mortgage Backed Securities ("RMBS") and Collateral Debt Obligations ("CDOs") in an unrelated investigation.

Mr. Zwerner spent hours analyzing certain bonds, provided the fruits of his efforts to the SEC, and met with SEC lawyers on multiple occasions.

## III.     Governing Legal Standards and Argument

### A.     Legal Landscape

Post-*Booker*, the Sentencing Guidelines are no longer mandatory.  *United States v. Booker*, 543 U.S. 220, 245–46 (2005); *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) (noting that the Sentencing Commission's advisory Guidelines are a "starting point," but that a sentencing judge is "in a superior position" to find facts relevant to each particular case (internal quotation marks omitted)); *United States v. Jones* ("*Jones II*"), 460 F.3d 191, 195 (2d Cir. 2006) (a sentencing court may consider its "own sense of what is a fair and just sentence under all the circumstances").  The Court must first calculate the correct advisory guidelines range, and then decide whether to impose a sentence within that range or outside of it.

In assessing the appropriate sentence, courts must apply factors set forth in 18 U.S.C. § 3553(a).  Under that statute, the sentence imposed must be sufficient, but not greater than necessary, to comply with its purposes; the court must consider all "kinds of sentences available" to achieve a just result.  18 U.S.C. § 3553(a)(3).

In addition, courts must consider the following factors in determining the particular sentence to be imposed:  the nature and circumstances of the offense; the history and characteristics of the defendant; the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)-(7).

**B.     An Application of Section 3553(a) Factors to Brian Zwerner Demonstrates the Propriety of a Non-Custodial Sentence.**

In this case, the offense to which Mr. Zwerner pled is conspiracy to falsify bank records under 18 U.S.C. § 1005, in violation of 18 U.S.C. § 371.  The penalty for violating section 371 is "fine[] under this title or imprison[ment] not more than five years, or both."  18 U.S.C. § 371. Probation is authorized for any offense with a statutory maximum below 25 years unless probation is expressly precluded (which it is not here).  18 U.S.C. § 3561(a); 18 U.S.C. § 3559(a); *see Gall v. United States*, 552 U.S. 38, 48-53 (2007) (upholding district court's sentence of probation where Guidelines range was 30-37 months).  We respectfully request that the Court consider a non-custodial sentence for Mr. Zwerner, and ask that, given Mr. Zwerner's dedicated cooperation and the significant payment of restitution he will have made by his sentencing date, the Court not impose a fine or other penalty.

> 1.     Mr. Zwerner's remarkable rehabilitation over the last six years illustrates the propriety of a non-custodial sentence.

Mr. Zwerner was 25 when he started working at Bank of America; he is now 41. Mr. Zwerner's participation in the conspiracy ended approximately 12 years ago.  For the last six years, Mr. Zwerner has cooperated with the government in its investigation of the conspiracy in which he formerly participated, as well as other matters about which it inquired.  *See supra* Section II.D.  In this time period, Mr. Zwerner has also turned his focus to his family and charitable endeavors.  Mr. Zwerner's illegal conduct is now well behind him and Mr. Zwerner is now a different man.

> a.     Mr. Zwerner's lengthy and consistent cooperation merits a non-custodial sentence.

Mr. Zwerner should receive significant credit for his considerable cooperation.  *See supra* Section II.D.  *C.f. Chhabra v. United States*, No. 09-cv-1028 (LAP), 2010 WL 4455822, at *2

(S.D.N.Y. Nov. 3, 2010) (in writ of error *coram nobis* context, noting decision by Judge Chin to impose a non-custodial term of probation where the government submitted a motion under U.S.S.G. § 5K1.1). It stands to reason that his cooperation contributed to the government's investigation into this complicated conspiracy and the successful prosecutions in the *Rubin/Wolmark/Zarefsky*, *Ghavami*, and *Murphy* cases, as well as the numerous guilty pleas obtained by the government in other cases. Mr. Zwerner's impressive cooperation is in service of some of the very goals of sentencing: His recognition of the error of his ways and whole-hearted determination to act with the government promotes "respect for the law," *see* 18 U.S.C. § 3553(a)(2)(A), and his unequivocal and consistent support for the government over six years also demonstrates the absence of any need for correctional treatment or further rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D). His cooperation, in addition to his commitment to family and community discussed herein, are aspects of the defendant's "history and characteristics" that counsel in favor of a non-custodial sentence. *See* 18 U.S.C. § 3553(a)(1).

Beyond the direct benefit to the specific cases Mr. Zwerner's cooperation helped build, Mr. Zwerner's extensive cooperation also benefited the government in other ways. Because Mr. Zwerner did not contest his case, he enabled the government to focus its investigative and prosecutorial efforts elsewhere. Further, as of his sentencing date, Mr. Zwerner will have paid to Bank of America restitution under the MVRA. In doing so, Mr. Zwerner has spared the Bank having to participate in these proceedings to recoup that money. These actions demonstrate Mr. Zwerner's respect for the law and law enforcement.

Finally, Mr. Zwerner's cooperation evinces his complete acceptance of responsibility and deep feelings of remorse for his conduct while participating in this conspiracy from 1999 to 2002. *United States v. Fernandez*, 443 F.3d 19, 24-25, 33-34 (2d Cir. 2006), *abrogated on other*

15

*grounds by Rita v. United States*, 551 U.S. 338 (2007) (noting district court's consideration of

cooperation as possible evidence of defendant's acceptance of responsibility).  This is further

corroborated by his conversations with his closest confidantes, with whom Mr. Zwerner

frequently discusses his remorse for his actions.  Mr. Zwerner's wife Jodie observed that

Mr. Zwerner "feels deep regret for his actions" and guilt for "the damage they have caused to so

many people,"  (Letter of J. Zwerner, Ex. 3, at 6-7), and Jodie told a probation officer "his

conviction 'really changed him a lot . . . .'"  PSR ¶ 74.  He has also expressed remorse to his

longtime friend Adam Hertzog, particularly for the effect his actions have had on his family

(Letter of A. Hertzog, Ex. 4, at 2), and to his old friend Jeffrey Lowe, who noted Mr. Zwerner's

"strong moral compass was evident as he took full responsibility that he could have done things

differently and truly wished he had."  (Letter of J. Lowe, attached hereto as Exhibit 8, at 2.)

Ricardo Diaz, a colleague and friend who has known Mr. Zwerner for over 15 years, said that

Mr. Zwerner is "extremely remorseful for the damage he has caused."  (R. Diaz Letter, attached

hereto as Ex. 9, at 2.)  *See also* PSR ¶ 46 ("[D]efendant fully admits that he made a mistake, and

he feels deeply sorry for the deleterious impact his poor decision is having on his family").

These painful and embarrassing conversations, along with Mr. Zwerner's cooperation, indicate

the veracity and depth of Mr. Zwerner's remorse.

> b.   Mr. Zwerner's meaningful contributions to his family and
> community, contributions he could continue to make if given a
> noncustodial sentence, demonstrate his rehabilitation and the
> appropriateness of a non-custodial sentence.

The effects of Mr. Zwerner's cooperation and guilty plea have permeated every aspect of

Mr. Zwerner's life, and impressively, he has taken those changes in the most positive way

possible.  In the over 12 years since the conduct at issue, and since Mr. Zwerner began to

cooperate with the government in the municipal bond bid-rigging investigation, Mr. Zwerner has

matured, and his life has changed dramatically, becoming the father of two children, and more recently, losing his own father to cancer.  As set forth above, Mr. Zwerner's career path has narrowed over the last several years; this has afforded him the time and opportunity to become such a strong, deep, and abiding presence in the lives of his wife, children, extended family, and community.

As described in Section II.A *supra*, Mr. Zwerner's young children and elderly mother rely on Mr. Zwerner for irreplaceable support, a fact which is appropriately considered by the court in assessing the proper sentence for a defendant.  *See United States v. Butler*, 264 F.R.D. 37, 40 (E.D.N.Y. Jan. 22, 2010) (imposing a significantly below-Guidelines sentence, partly due to finding that "[i]t is unlikely that [defendant] will engage in further criminal activity in light of his continuing supervision, the need to provide for his wife and young son, and the support of his family and many friends and associates"); *United States v. Bertelle*, No. 09-cr-253, 2010 WL 276597, at *2 (E.D.N.Y. Jan. 19, 2010) (imposing below-Guidelines sentence of time served along with restitution, forfeiture, and supervised release, relying in part on fact that "[d]espite his involvement in this conspiracy, the defendant . . . has demonstrated a strong work ethic, and is a member of a loving family profoundly impacted by the defendant's . . . conspiracy"); *see, e.g.*, *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (noting, in a decision limited to its facts, that "it is the families of defendants that are the intended beneficiaries of downward departures on the ground of extraordinary circumstances relating to family responsibilities") .[2] Respectfully, this Court should take into account Mr. Zwerner's intense family ties, and consider

---

[2] In support of our argument that Mr. Zwerner is entitled to a non-custodial sentence, we refer to cases involving both downward departures and those granting non-Guidelines sentences based on the factors set forth in 18 U.S.C. § 3553(a).

the deep loss which would be suffered by his wife, children, sister, and mother if Mr. Zwerner were to receive a custodial sentence.

In addition, Mr. Zwerner has contributed significantly to the success of Respect Game, and continues in those efforts, even though his son now participates in a different league.  (*See* Letter of R. Winfrey, Ex. 6, at 2.)  Mr. Zwerner's donation of his time and talents, as a chaperone and the head of fundraising, as well as his financial contributions, demonstrate his value to the community in which he resides, and reflect his rehabilitation into a man with deep respect for his community.  A non-custodial sentence would permit Mr. Zwerner to continue these types of meaningful contributions to Respect Game and other local Atlanta organizations.

> 2.    A non-custodial sentence would ensure that Mr. Zwerner is punished sufficiently but not more than necessary.

Mr. Zwerner's reputational loss, the marked diminution of recent and future earnings, the fact he will have made restitution, and the emotional and stressful toll this has taken on Mr. Zwerner and his entire family all constitute sufficient general deterrence against similar conduct.

Mr. Zwerner lost a once-promising career as a result of his conduct.  Once Mr. Zwerner began cooperating with the government, knowing that he would be pleading guilty to his conduct, Mr. Zwerner had few employment options available to him.  With his sentencing looming, Mr. Zwerner's options in the securities industry constricted even further.  In April 2014, in anticipation of this Court's sentencing, Mr. Zwerner resigned from FIG Partners, continuing to work for the month of May on a consulting basis effectively to transition his functions to others.  PSR ¶ 92.  In June, Mr. Zwerner accepted from the SEC a complete bar from, *inter alia*, "associat[ing] with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization."

Offer of Settlement of Brian Scott Zwerner, attached hereto as Exhibit 10, at 3.  This change in the intensity and trajectory of Mr. Zwerner's career, while difficult, was also an opportunity for Mr. Zwerner to become even more involved in the lives of those who mean the most to him.  *See supra* Section II.A.

Although Mr. Zwerner has taken these career changes in stride, in the most positive way possible, the loss of a livelihood for which he trained is a meaningful consequence and deterrent. The loss of livelihood can constitute grounds for a non-Guidelines sentence.  Another court sentencing Mr. Zwerner's co-conspirator considered the impact of an industry bar in choosing to order a non-custodial sentence.[3]  *See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (upholding below-Guidelines sentence of probation plus $15,000 fine where defendant had cooperated, accepted responsibility, posed no recidivism risk, and had "suffered substantially due to the criminal investigation into his wrongful actions"); *cf. United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *Lieberman v. United States*, 839 F. Supp. 263, 264 (S.D.N.Y. 1993) (noting defendant in *Gaind* "lost not only his specific business but his ability to reenter the field of environmental testing, which was in Gaind's case the only pathway likely to lead to further illegal activity on his part.").  Mr. Zwerner, whose entire professional experience has been in the securities industry, will now have to reinvent himself entirely.  Although he accepts this challenge as a consequence of his actions, this is a meaningful penalty Mr. Zwerner has already begun to pay.

This challenge is made more difficult by the negative publicity attendant to Mr. Zwerner's guilty plea in this high profile investigation.  The diminishment of a defendant's

---

[3] Transcript of Sentencing at 25, *United States v. Naeh*, No. 10-CR-139 (May 8, 2014), ECF No. 24; *see also* PSR ¶ 5 (Naeh sentenced to no imprisonment time and no supervised release).

reputation is another ground on which to impose a below-Guidelines sentence.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (imposing a non-Guidelines sentence, noting, among other facts, that "[w]ith his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct.").

Moreover, Mr. Zwerner is at low risk for recidivism, particularly considering his exemplary behavior during his lengthy cooperation, and a prison sentence would have little value as a specific deterrent.  "[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects."[4]  This conclusion is uniform across "[t]hree National Academy of Science panels" and "every major survey of the evidence."[5]  Research regarding white collar offenders in particular found no difference in the deterrent effect of probation and that of imprisonment.[6]  According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."[7]  In the over six years Mr. Zwerner has been cooperating, he has essentially been subject to conditions similar to probation.  At least one court sentencing one of Mr. Zwerner's co-conspirators has recognized the value of a non-custodial sentence where a longtime cooperator has complied with conditions "tantamount" to probation.[8]  Having admitted

---

[4] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

[5] *Id.* at 28-29; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

[6] *See generally* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra* note 5, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

[7] Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S (2011).

[8] Transcript of Sentencing at 10, *United States v. Zaino*, No. 10-CR-434 (S.D.N.Y. Mar. 27, 2014), ECF No. 23 ("I sentence you to time served.  I agree with your lawyer that you have essentially been on something tantamount to supervised release for many years and that you do not need to be on supervised release going forward.").

to his role in the scheme, Mr. Zwerner has spent the last several years knowing that any

additional criminal acts, or any weakness or fault in his cooperation with the government, would

jeopardize any benefit he could receive from his cooperation.  Having surrendered his passport in

2011, Mr. Zwerner has already spent three years in compliance with travel restrictions typical of

probation, further demonstrating the low risk of recidivism and the appropriateness of a non-

custodial sentence.[9]  Finally, given that Mr. Zwerner is no longer able to practice in the industry,

his risk of recidivism is especially low.[10]

> 3.    A non-custodial sentence is particularly appropriate given that
>        Mr. Zwerner will have already paid restitution to the victim of his crime.

Mr. Zwerner recognizes the importance of providing restitution to Bank of America, the

victim of his offense.[11]  He is remorseful for his crime and he understands that his conduct

injured his former employer.  Accordingly, Mr. Zwerner, in advance of sentencing and to

demonstrate his contrition, will have made payment of restitution to Bank of America in the

amount of $890,000.[12]

Mr. Zwerner's eagerness to do so, even though he is facing diminished career prospects

for the rest of his life, reflects his contrition and counsels in favor of a non-custodial sentence, in

part because this significant payment itself is a considerable general deterrent to future criminal

conduct by others.  18 U.S.C. § 3553(a)(2)(B).  This is particularly notable given the

---

[9] Notably, the inability to travel was a professional hardship for Mr. Zwerner, who had worked abroad for Bank of America, and was not able to keep up business contacts he made there or use them to develop his consulting business.

[10] *See* Transcript of Sentencing at 25, *United States v. Naeh*, No. 10-CR-139 (May 8, 2014), ECF No. 24.

[11] Restitution is required under the MVRA, 18 U.S.C. § 3663A.

[12] In a case related to this conspiracy, the court approved a restitution agreement between the parties struck in advance of sentencing.  Transcript of Sentencing at 14, *United States v. Wright*, No. 12-CR-551 (S.D.N.Y. Oct. 23, 2013), ECF No. 19 (stating, after defense counsel represented that "full restitution has been made," that  "none need be made now").

comparatively small or non-existent financial consequences felt by similarly situated co-conspirators and cooperators who have previously been sentenced, as set forth *infra* in Section III.B.4.

This, in addition to the bar from the industry, creates a tenuous financial future for Mr. Zwerner.  Given collateral consequences Mr. Zwerner has already begun to suffer, a non-custodial sentence would reflect seriousness of offense, promote respect for the law, and constitute a just punishment.

> 4.    Principles of horizontal equity among defendants demonstrate the appropriateness of a non-custodial sentence for Mr. Zwerner.

The federal sentencing statute makes sentences imposed on other defendants relevant to this case.  Under 18 U.S.C. § 3553(a)(6), one factor in sentencing is the need to avoid unwarranted disparities between similarly situated defendants.  In the Second Circuit, it is "appropriate for a district court . . . to impose a sentence that . . . reflect[s] the extent to which the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly."  *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007), *abrogated on other grounds by United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008); *cf. United States v. Menendez*, 600 F.3d 263, 269 (2d Cir. 2010) (although district courts may compare co-defendants' sentences, disparities between sentences may be warranted where one co-defendant pled guilty, or pled to lesser or different charges).  "[W]here there is a disparity between co-defendants' sentences, 'we may remand [if a] defendant credibly argues that the disparity in sentences has no stated or apparent explanation.'"  *United States v. Valentin*, 239 F. App'x 674, 677 (2d Cir. 2007) (summary order) (quoting *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006)).

Mr. Zwerner's conduct was more limited than other conspirators in this case. Mr. Zwerner was charged with a single count of conspiracy to make false entries in bank records

in violation of 18 U.S.C. § 371.  In contrast, all but one of the defendants in related cases were charged with multiple counts of conspiracy and with wire fraud.  Mr. Zwerner's charge reflects his role in this conspiracy.  Further, unlike many other defendants, Mr. Zwerner early on accepted responsibility for his crime and cooperated with authorities extensively; Mr. Zwerner stands out as a defendant who has shown remorse and has been willing to help the government.

Very few defendants who pled guilty in related cases, including those with a much larger role in the conspiracy, received custodial sentences.  Of the 12 individual defendants in cases related to this conspiracy who pled guilty, only four received custodial sentences;[13] none of those defendants are similarly situated to Mr. Zwerner.  For example, Evan Zarefsky brokered nine of the 10 fraudulent deals at issue in the conspiracy and only pled guilty on the eve of trial.[14]  Like Mr. Zarefsky, Matthew Rothman was personally responsible for brokering fraudulent deals at CDR.  During the period of the conspiracy, he brokered six of 10 fraudulent deals for which the government prosecuted the conspirators.[15]  Zevi (Stewart) Wolmark was a senior manager at

---

[13] In addition, several defendants in cases related to this conspiracy did not plead to the charges against them, but were instead convicted at trial.  Three defendants, Dominick Carollo, Peter Grimm, and Steven Goldberg, were convicted at trial but had their convictions reversed on procedural grounds on appeal.  *See* PSR ¶¶ 15-17; *United States v. Carollo*, 10-CR-654-01 (S.D.N.Y. 2012); *United States v. Goldberg*, 10-CR-654-02 (S.D.N.Y. 2012); *United States v. Grimm*, 10-CR-654-03 (S.D.N.Y. 2012).  Three other defendants, Peter Ghavami, Gary Heinz, and Michael Welty, have been convicted after trial and sentenced.  PSR ¶¶ 19-21; *United States v. Ghavami*, 10-CR-1217-01 (S.D.N.Y. 2013) (sentenced to 18 months' imprisonment and no supervised release for Conspiracy to Defraud the United States, Wire Fraud, and Conspiracy to Commit Wire Fraud); *United States v. Heinz*, 10-CR-1217-02 (S.D.N.Y. 2013) (sentenced to 27 months' imprisonment, three years' supervised release, and 500 hours community service for Conspiracy to Defraud the United States, Wire Fraud, Conspiracy to Commit Bank Fraud, and two counts of Conspiracy to Commit Wire Fraud); *United States v. Welty*, 10-CR-1217-03 (S.D.N.Y. 2013) (sentenced to 16 months' imprisonment, three years' supervised release, and 500 hours community service for Conspiracy to Defraud the United States, Wire Fraud, and two counts of Conspiracy to Commit Wire Fraud).

[14] PSR ¶ 14; Government's Consolidated Application for Restitution at 9-10, *United States v. Wolmark and Zarefsky*, No. S1 09-CR-1058 (S.D.N.Y. July 9, 2013), ECF No. 418.

[15] PSR ¶ 6; Government's Consolidated Application for Restitution at 9-10, *United States v. Rothman*, No. 10-CR-200 (S.D.N.Y. July 9, 2013), ECF No. 418.

CDR, where he oversaw the company's engagement in criminal bid-rigging activity, including the fraudulent deals brokered by Mr. Zarefsky and Mr. Rothman.  During the course of the conspiracy, Mr. Wolmark was personally involved in brokering nine of 10 fraudulent deals for which the government prosecuted the conspirators;[16] like Mr. Zarefsky, he only pled guilty on the eve of his own trial.  Finally, Adrian Scott-Jones, who maintained the conspiracy by personally rigging bids and arranging kickbacks, took the stand at his co-conspirators' trial, committed perjury, and then fled the courthouse in the middle of his cross-examination, never to return to complete his testimony.[17]

As the Court assesses his conduct, Mr. Zwerner respectfully requests that it consider the horizontal equities in play and the stark differences between Mr. Zwerner and those few defendants who have received custodial sentences.

In contrast, and in cases much more similar to Mr. Zwerner's, the vast majority of the cooperating defendants (each of whom pled to more crimes and were more integral to the conspiracy) have received non-custodial sentences.[18]  Even David Rubin, the president of CDR and at the heart of the broader conspiracy, was sentenced to time served and two years' supervised release, along with a significant fine.  PSR ¶ 12.  Furthermore, unlike most of these defendants, Mr. Zwerner has paid Bank of America restitution:

---

[16] PSR ¶ 13; Government's Consolidated Application for Restitution at 9-10, *United States v. Wolmark and Zarefsky*, No. S1 09-CR-1058 (S.D.N.Y. July 9, 2013), ECF No. 418.

[17] Transcript of Sentencing at 8-11, 13, *United States v. Scott-Jones*, No. 10-CR-794 (S.D.N.Y. Jan. 3, 2013), ECF No. 22.

[18] Two of the 12 defendants in related cases, Douglas Goldberg and Mark Zaino, received sentences of "time served" after cooperating with the government for eight years.  PSR ¶¶ 6-7; Transcript of Sentencing at 11, *United States v. Goldberg*, No. 10-CR-209 (S.D.N.Y. May 8, 2014), ECF No. 30 (adopting probation's recommendation of time served); Transcript of Sentencing at 10, *United States v. Zaino*, No. 10-CR-434 (S.D.N.Y. Mar. 27, 2014), ECF No. 23 ("I sentence you to time served. I agree with your lawyer that you have essentially been on something tantamount to supervised release for many years and that you do not need to be on supervised release going forward.").

Martin Kanefsky:  Mr. Kanefsky pled guilty to two counts of conspiracy in violation of 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. § 1343.  As chief of the financial firm Kane Capital Strategies, Inc., Mr. Kanefsky enabled the conspiracy by permitting certain bidders to have "last looks" at bids.[19]  He was sentenced to no term of imprisonment and two years of probation.[20]  Mr. Kanefsky was ordered to pay a $30,000 fine, complete 200 hours of community service, and no restitution.

Douglas Lee Campbell:  Mr. Campbell pled guilty to two counts of conspiracy in violation of 15 U.S.C. § 1 and 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. § 1343.[21]  As a senior marketer at Bank of America, Mr. Campbell brokered illicit deals with CDR, the company directing the bid-rigging conspiracy.  He also submitted intentionally losing bids to further the conspiracy, and paid kickbacks to CDR employees.[22]  Mr. Campbell was sentenced to no time in custody and no supervised release.[23]  Mr. Campbell was ordered to pay no fine and no restitution.

James Leonard Hertz:  Mr. Hertz pled guilty to two counts of conspiracy in violation of 15 U.S.C. § 1 and 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. § 1343.  As an employee at Chase Bank, he engaged in "last looks" at competitors bids to further the bid-rigging conspiracy.[24]  He was sentenced to no time in custody, no supervised release, and no probation.[25]  Mr. Hertz was ordered to pay no fine, but restitution was not resolved prior to sentencing.

Alexander Wright:  Wright pled to conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.[26]  Mr. Wright, at the time of his plea and prior to rulings by the Court on the appropriateness of restitution, agreed to pay $29,600.  Mr. Wright was sentenced to no time in custody and one year of probation and a $1000 fine.  In imposing that

---

[19] Transcript of Sentencing at 6, *United States v. Kanefsky*, No. 10-CR-00721 (S.D.N.Y. May 17, 2013), ECF No. 18.

[20] *Id.* at 19.

[21] PSR ¶ 9.

[22] Sentencing Letter by United States as to Douglas Lee Campbell at 4-5, *United States v. Campbell*, No. 10-CR-803 (S.D.N.Y. Apr. 24, 2014), ECF No. 26.

[23] PSR ¶ 9; Transcript of Sentencing at 15, *United States v. Campbell* No. 10-CR-803 (S.D.N.Y. Apr. 22, 2014), ECF No. 28.

[24] Transcript of Sentencing at 5, *United States v. Hertz*, No. 10-CR-1178 (S.D.N.Y. Dec. 18, 2013), ECF No. 38.

[25] *Id.* at 20; PSR ¶ 10.  The four other cases involved in this conspiracy are *United States v. Goldberg*, 10-CR-209 (S.D.N.Y. 2014); *United States v. Naeh*, 10-CR-139 (S.D.N.Y. 2014); *United States v. Rubin/Chambers, Dunhill Ins. Servs., Inc.*, 09-CR-1058 (S.D.N.Y. 2014); and *United States v. Zaino*, 10-CR-434 (S.D.N.Y. 2014).  None of the defendants in those cases were sentenced to prison terms.  PSR ¶¶ 5-7, 11.

[26] Transcript of Sentencing at 12-13, *United States v. Wright*, No. 12-CR-551 (S.D.N.Y. Oct. 31, 2013), ECF No. 19.

sentence, the court noted that "*a sentence of probation will put [Mr. Wright's] sentence at a level that is appropriate vis-à-vis others who have cooperated.*"[27]

Three of these four defendants were charged with two more crimes than Mr. Zwerner, and none received a custodial sentence. In addition, Mr. Campbell admitted that he was not truthful with the government in some of his early proffer sessions.[28] No such claim has been—or can be—made of Mr. Zwerner.

Mr. Zwerner stands out among defendants in this conspiracy for having agreed to pay restitution before his sentencing. Of 12 defendants in related cases who plead guilty, only one, Alexander Wright, affirmatively settled his restitution obligations prior to sentencing.[29] David Rubin was ordered to pay approximately $2.1 million in restitution (as well as a $1.5 million fine), and to guarantee approximate $2 million owed by the entity CDR. Several other defendants' (Messrs. Goldberg, Zarefsky, and Naeh) restitution orders were held in abeyance with a likely outcome of no restitution ultimately becoming due, and as to four (Messrs. Hertz, Rothman, Scott-Jones, and Wolmark), restitution was not resolved at sentencing. In addition, three defendants in related cases were sentenced to pay no restitution at all;[30] each of those three defendants was convicted of more crimes than Mr. Zwerner and played a more significant role in the conspiracy.[31]

---

[27] *Id.* at 13 (emphasis added).

[28] Sentencing Letter by United States as to Douglas Lee Campbell at 6, *United States v. Campbell*, No. 10-CR-803 (S.D.N.Y. Apr. 24, 2014), ECF No. 26.

[29] Transcript of Sentencing at 14, *United States v. Wright*, No. 12-CR-551 (S.D.N.Y. Oct. 31, 2013), ECF No. 20.

[30] Those three defendants are Douglas Lee Campbell, Mark Zaino, and Martin Kanefsky. *See United States v. Campbell*, 10-CR-803 (S.D.N.Y. 2014); *United States v. Zaino*, 10-CR-434 (S.D.N.Y. 2014); *United States v. Kanefsky*, 10-CR-721 (S.D.N.Y. 2013).

[31] Douglas Lee Campbell pled to pled guilty to two counts of conspiracy in violation of 15 U.S.C. § 1 and 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. § 1343. Martin Kanefsky pled guilty to two counts of conspiracy in violation of 18 U.S.C. § 371, and one count of wire fraud in

Thus, it would create unwarranted disparity to impose a custodial sentence or additional financial penalties upon Mr. Zwerner.  *See United States v. Santos*, 406 F. Supp. 2d 320, 325-6 (S.D.N.Y. 2005) (granting a below-Guidelines sentence based on Section 3553(a)(6) disparities between defendants); *United States v. Duran*, 399 F. Supp. 2d 543, 548 (S.D.N.Y. 2005) (noting that 18 U.S.C. § 3553(a)(6) is intended to "reduce significant deviations in sentencing involving supposedly comparable offenses, offenders and circumstances . . . .").

---

violation of 18 U.S.C. § 1343.  Mark Zaino pled to two counts of conspiracy, one in violation of 15 U.S.C. § 1 and one in violation of 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. §§ 1343, 1346.  In contrast, Brian Zwerner pled to a single charge of conspiracy to make false entries in bank records in violation of 18 U.S.C. § 371.

**IV.     Conclusion**

Mr. Zwerner's contrition and rehabilitation, evidenced through his personal life choices, his commitment to his family and the community, and in his dedicated cooperation, coupled with the other relevant factors under section 3553(a), warrant a non-custodial sentence.  Critically, in the over 12 years since the acts in question, Mr. Zwerner has committed no other misconduct, and has spent the past six years cooperating with the government in every way it asked of him. Under these circumstances, respectfully, a non-custodial sentence, combined with the restitution Mr. Zwerner will have already paid in the substantial amount of $890,000, and the bar he has accepted from the SEC, will reflect the seriousness of the offense, promote respect for law, reflect equity with the sentences of others in the conspiracy, and provide just punishment for the offense.

Dated: July 23, 2014                                         Respectfully submitted:

                                                  By: /s/ Katya Jestin
                                                      Katya Jestin
                                                      Anne Cortina Perry
                                                      JENNER & BLOCK LLP
                                                      919 Third Avenue, 37th Floor
                                                      New York, New York  10022

                                                      *Counsel for Brian Scott Zwerner*